We will hear argument first this morning in Case 15-214, Murr v. Wisconsin. Mr. Groen. Mr. Chief Justice, and may it please the Court, the fundamental unfairness in this case is illustrated by one fact. If anyone else in the world, other than the Murr siblings, owned Lot E, that owner could sell or develop it, but the Murrs cannot. Let me ask you this question. It's a hypothetical. It's not this case. Suppose that three years from now, lots such as these, two lots in the same ownership, become immensely more valuable than the two lots singly. Each lot singly would be worth $100,000, but these lots where you can build a bigger home are worth $500,000. The county wants a fire station, and it takes Lot E. What do they pay for it, under your theory? They should pay compensation for the taking of Lot E. Which is $100,000, so under your hypothetical, property owners stand to lose $300,000, under my hypothetical, and your answer. No, I don't think so. Under the hypothetical... Singly, they're worth $500,000. Singly, they're worth $100,000 each. What is the amount that the county has to pay to take Lot E for the fire station? The analysis must begin with defining the relevant parcel that's the subject of the analysis. And under your view, that's Lot E only. That's right. And they pay $100,000 only, that's it. The landowner would have the burden of proving that there are additional damages that they should be compensated for. But the presumption... You can't get it. There's no severance damages. You're taking the entire parcel. You're taking all of Lot E, and they should be paid compensation for Lot E. That's $100,000, and so under your theory, landowners, in the hypothetical that I put up, would lose money, and the state would be getting the windfall. If that hypothetical does not include any integrated economic use between those two parcels, that is correct. The compensation is determined by the lot that is taken. But the integrated use is determined by the market. Your theory completely ignores market factors. And that is exactly what the government would argue, is that the compensation must be limited to the parcel that is taken. And in eminent domain law, which is the hypothetical that you're providing, in eminent domain law, the presumption is exactly that. Compensation is limited to the parcel taken. Unless that presumption can be overcome by the landowner proving that the two parcels are actually... There's a unity of use between the two... Then why isn't that true here? Then why doesn't that defeat your theory here? It supports the theory. It's the exact same principle, only in reverse, rather than the government limiting compensation to just the parcel taken. Here, the government is saying, we want to combine the values of the two in order to find there's no taking. But in both scenarios, you have to begin with the presumption of determining what is the relevant parcel that is subject to that analysis. In both scenarios, either eminent domain or inverse condemnation, you have to begin with a single parcel. Mr. Groen, can I ask just a clarifying question about your argument? Because one of the things that makes this case odd is that there are family members all around. Both sellers are the same family, and the buyers are the... But if I'm right, your argument would extend in the exact same way to a situation where you have two sellers who are completely independent of each other. Mr. Jones and Ms. Smith have nothing to do with each other. Another buyer comes in, also has no relationship with Mr. Jones or Ms. Smith. And that buyer would be able to make the exact same argument that the Murr family is making in this case. Am I right about your argument? Well, I'm not sure which parcel your hypothetical is talking about. So you have two pre-existing substandard parcels. Somebody comes in, buys both, but all the parties are independent of each other. And now the person who has bought these two substandard lots wants to build on them, and your argument would be the exact same. That's right. They're each independent, discrete, and separate parcels. And the grandfather clause that is attached with this land use ordinance would protect the development and sale rights of each parcel independently. So where does a state's regulatory power come in? Justice Kagan put in a hypothetical. One owner owns two parcels, or two different people own two parcels, and they sell it to your one owner. And the one owner knows the regulation says if you have two contiguous land pieces, you can only develop on one if they're both below an acre or whatever the rule is. Your rule would just do away with your expectations as a buyer. Well, no. In that situation, the fact that someone might know that there are regulations on properties does not change the time of the taking. The taking occurs in 1975 when the regulations redefined the property rights, and that redefinition of the property rights does not insulate... But the parents, it may have been a taking for the parents, but they never charged it. The children, when they took, were subject to the regulation, and they knew it. They could have said, no, I don't want two contiguous ones, Dad and Mom. I'll go buy the next door lot from someone else. And this court in Palazzolo v. Rhode Island ruled that the notice that the Murr children may have had, they actually didn't know, but let's assume that they did know. They should have known. Let's assume that. Let's assume that Beyond should have. They actually knew. Palazzolo stands for the proposition that the subsequent heir or a buyer does not lose a takings claim. The state is not absolved of liability. That's a very different situation. In Palazzolo, all we said was that if the seller has a takings claim, it's not extinguished just because the property is transferred, that the buyer could have the exact same takings claim. But the Murr children are not asking for this. They do not have the same takings claim as the Murr parents did. Isn't that right? No, I think that's not right. They have the exact same takings claim because we're talking about Parcel E and the rights that inherently develop on Parcel E. The children can't. The parents, if they had put it in their own common ownership, which they did for a period of time subsequent to 1975, there is a takings claim there. It's the rights inherent in the property. And in each of these, in all of these scenarios, you have to go back to the parent. Let me try this again. For the parents, the two properties were two properties. It's only when the property becomes one property that this takings claim arises. The takings claim arises because of the restrictions imposed by the government, not by change in ownership or anything like that. The change in ownership does not change the nature of the property interest. That's the key part of Palazzolo, that if you take away the takings claim or redefine property interest, you're actually changing or altering the nature of property. And that's where we come back, not to a takings analysis, but to defining the relevant unit of property to apply the takings analysis. I'm sorry. No, follow up. The regulation here, the only thing that it affected for the Murr parents and for the plumbing company was their ability to sell to a buyer who wanted to combine these two lots. That was the only thing that was affected. Isn't that right? Well, the parents didn't seek to combine these two lots or to sell to someone who wanted to combine the two lots. The parents owned both parcels. They had one in the plumbing company name. They eventually put that in their own names as well in 1982, after the 1975 restrictions were in place. That didn't merge the parcels. There hasn't been a merger here. Merger is simply a term that describes what happened, and that is that the use restrictions preclude the independent sale or development of lot E. That is the gravamen of the takings complaint. These merger rules have a long history. Many states have them. Why isn't that background state law that would apply? There are lots of land use regulations of all types, including merger provisions. We do not have a background provision here, a background principle, because you can't have a background principle that applies to one person but not to another. If someone else owned lot E, they can develop it. It's not a background principle to say that this only applies to the MERS. Same thing in the neighborhood. This is the St. Croix Cove subdivision. There's over 40 developed residential lots here. There's nothing about building a home on this property that rises to the level of a nuisance or something that takes the right to use the property out of the title that is that property. The answer to Justice Ginsburg is that all of those other state regulations are also invalid. No. Those regulations are fine, whatever they may be, and they come in all types of forms. The question here is what unit of property do we utilize for determining the takings analysis? Once you determine that, then you determine, okay, under that merger law or whatever land use ordinance, does it reach a level of magnitude of interference that there is a taking? And those would have to be analyzed on the merits of their own. I thought your argument was that under state law, the properties were not formally merged, that the merger was only, I think as the court put it, an effective merger. That's exactly right. There has been no formal merger. These remain separate legal lots today. This term merger has been used very loosely, and all it really means is that the merge right to independently use and develop lot E has been destroyed. They could actually still give it away. I'm sorry. Do we know exactly how Wisconsin and the county define common ownership? For example, if one lot is owned by an individual in that person's own name and then the adjacent lot is owned by a wholly owned corporation or LLC, is that considered to be common ownership? Or if one lot is owned by, let's say, four siblings and the other one is owned by only three of the siblings, would that be common ownership? Under the way Wisconsin has applied common ownership, as long as they are not in formally the same name, so here, William and Dorothy Merck, they fully owned their plumbing company. And so they were technically in different ownership, and that was enough to be in separate ownership. Would it be enough if a husband owned one, wife owned the other?  That's separate? The way Wisconsin has been applying it, it would encourage that kind of manipulation and bring in incentives. I mean, I've not gone beyond Holmes. Holmes says that a regulatory taking violates the Constitution, unless it's compensated, when it goes too far. Correct. All right. Now, what you want us to do is to put some pretty clear lines in that word too far. My problem is I can't think of just what those lines should be, that perhaps there are many different circumstances and many different factors. For example, in your case, I imagined that what the state was concerned about is they want to preserve a lake. At the same time, people own some property around that lake, and they used to be able to build houses. So here's what they say. You can build one. One. And it doesn't matter if you have six lap parcels not together or one. One is what you can build, because after all, this Constitution is concerned about, to paraphrase Justice Warren, protecting people, not rocks. And so we look at the people and say, how does this affect them? And in this case, you have a case, but there are some factors against you. And the Federal Circuit and other opinions of ours have avoided drawing clear lines. Well, you see where I'm going, and I just want your general response. Yes. This case does not address the merits of whether there is a taking. This case first has to deal with the threshold question of what is the relevant unit of property. And that's what I'm objecting to. Now you're not getting my question, because my question is, well, I look for that. Is it relevant? Yes. Is it determinative? No. If we start making determinative rules, developers will take 500 acres. They'll break them down into 500 different properties, state perhaps aiding in this, 500 different ones. Three of them will be just wetlands, and they'll say, see, you took my three. When actually he started out with 500, and it wasn't a big deal. You see the kind of problem they're written about in the briefs? I want your general reaction. Well, the general reaction is you must begin with the approved legal lots of record that have actually been approved and that have attained, because they're legal lots of record, they have rights that are secured. That's what Roth is all about. One of the oddities of your position is that you seem to be taking half of state law. In other words, you're saying, well, there are these lot lines, and everything has to depend on the lot lines, because they've been legally approved. But there have been other things in this case that have been legally approved, too, and one of them is this merger provision. And you seem to be saying, well, we look to state law for the lot lines, but then we ignore state law for the question of when lots are merged. And why should we do that? If we're looking to state law, let's look to state law, the whole ball of wax. In other words, saying, well, when I buy those two lots, they're really not two lots anymore. According to state law, they're one lot. In defining property interests, Roth and this court in Lucas Note 7 both recognize that you look to the state law, that governs the creation, that's the legal recognition of lots and the protection of the property interests. Well, I can say I think that you're right, Mr. Groen. It's like the legal recognition of property. But the legal recognition of property has something to do with lot lines, and it also has something to do with when lots are merged, when two lots are merged into one. And why would we ignore that question of merger? There's two reasons. One, they have not been merged, and that's the point we were discussing earlier. They have not been formally merged. What would it take to be formally merged? Elimination of lot lines. Why? And that has not happened because they remain. The state can say we don't have to eliminate lot lines. All we have to do is to say that the lot lines don't have legal effect for some purposes. And it's only for the limited purposes of precluding sale or development. But more than that, your question comes right back. It circles right back to Palazzolo, where you really have to define property interests by the rights that are already in place that secure benefits. That's what Roth stands for. That's what Lucas footnote 7 stands for. And Palazzolo points out the principle that you cannot then go forward and say, oh, well, the state has redefined this. Again, I think Palazzolo depends on the buyers having the exact same takings claim as the sellers, which it seems to me does not exist in this case. But let me ask you a different way around the question, which is whether you think reasonable expectations matter at all in your framework. The reasonable expectations that were addressed in Lucas footnote 7 are the expectations that grow out of the traditional understandings of property law. People understand when they buy a lot in a subdivision that they are buying a lot that has a right of use, that has a deed, it has geographic boundaries, and that's what they're buying from. Okay, but here, if I'm buying property in this area, I also know that there are these rules about when you can develop on substandard lots and how it is that contiguous lots are understood for purposes of that development potential. So why aren't I buying subject to those preexisting regulations? In other words, this is not a regulation that just happened to me when I was an owner. I'm buying subject to, and property is a bundle of sticks, we know that, right, first year of law school. And I'm buying, you know, certain meets and bounds, but I'm also buying into a certain set of things about what I can and can't do on the property. So why isn't that perfectly consistent with my reasonable expectations? I'm supposed to know the zoning regulations, and when I buy a house, when I buy a piece of land, I'm buying subject to the preexisting zoning regulations. I understand the use of reasonable expectations under the Penn Central for determining whether there is a taking, but here we have to first determine what unit of property. Is it lot E or is it lot E and F combined? And in that situation, you have to look at the creation of the property. Property is property, and it doesn't change. That's true, but what about, of course, property is property, but we are still dealing with a provision of the Constitution that in the regulatory area is designed to prevent takings that hurt somebody unreasonably. It goes too far. So why isn't what you want to look at one thing to look at? But we might look at others, too. We might look, for example, at whether the individual who bought that property at the time he bought it knew about this restriction. We might look at how overall he is hurt in any related way. We might look, for example, at the kind of need that was there, and we might see two big questions. I mean, one big question is, though it's awfully general, is is he being treated unfairly either because we're forcing on him the whole cost or a lot of the cost of something that benefits many, many others, or because we are interfering with investment-backed expectations? I mean, as you read the cases, it seems to me there are a set of factors like that, and my problem with your argument is it wants to take one and then apply a kind of mechanical test. Now, it keeps coming back to the task is to first define the unit of property. The Murr parents have two separate distinct lots. Each is a lawful legal building site, and if owned by anyone else, it remains a lawful legal building site. Under the restrictions enacted in 1975, it went from two building sites to one building site. That is what has been lost. May I ask a question? I do think, as I'm reading all the briefs in this case, that the issue is how much weight should we be giving to the state boundary lines, the state property lines? You say, as a denominator on the takings claim, it's fixed. You use the word presumption in your brief, but you haven't explained to me what overcomes the state boundary lines properly. So I don't think the word presumption has any meaning in your brief. Others, like St. Croix and the government, and embedded in Justice Breyer's question, think the denominator should be a more nuanced calculation, although St. Croix, Wisconsin, and the solicitors seem to have a different weight to that. So let's start with, is yours a fixed presumption? Does anything ever overcome it? Or is it under every circumstance the denominator? You must begin with the presumption of identifying the single parcel. And nobody, as you point out, no parties. And that presumption is overcome if you have facts that are sufficient to show, in fairness and justice, that the individual should bear the burden. And an example we can draw straight out of eminent domain law, if you have a hotel owned by a person and they own the parking lot next door, they're two separate parcels, and government is going to condemn the parking lot. The parking lot is used with the hotel as an integrated economic unit. The presumption in eminent domain law is the same principle here. Government is taking only the parking lot, and they will argue we only pay for the parking lot. The burden then shifts to the property owner to prove that the parking lot is an integrated part of the operation of the hotel. What's the difference between that and the factors that the other parties are using that says, look at how the property has been used over time. Here the family has a house on one parcel, a volleyball court and a barbecue storage area on another. They use the other parcel, house on one side, the other parcel as access to the beach. The house has not had an economic value to the children. It was there. They're using it. So what's the difference? I think you have an inaccurate visual understanding of what the parcel is. Lot E, and this went up on summary judgment, is a vacant parcel. There's nothing on Lot E. It is its own independent parcel. The MERS will sometimes walk across it or maybe play volleyball on it, but it is not an integrated economic unit as in the hotel parking lot and the hotel. In that situation, you can overcome the presumption, and that landowner in that situation will argue that they should be paid compensation. Well, why isn't it an integrated unit because they have a barbecue? In other words, you're hypothetical. They don't have a barbecue. Well, whatever they have. Volleyball. Volleyball court. Under your hypothetical, if the hotel was on Lot F and the parking lot was Lot E, what would be the fair value if the state took Lot E for a firehouse? Can you figure out the fair value? Don't you figure out the value of that on the market to a buyer, not the loss to the seller because he's next door? It has to be. The rule begins with paying for the parking lot and the burden is on the landowner to show that that person should get additional compensation for the impact to the hotel. That's where that compensation comes from. That just can't be if they're separate lots. That's not the law in any state that I know. That's the unity of use rule that is in condemnation all the time. But that's when there's a single parcel. No, that's when there are two separate parcels. It's the hotel and parking lot example. Well, then under your view, the landowner wins either way. It depends. If the value is great, he gets the double value. If the value is smaller, then he can sell the lot. There has to be in that unity of use. So, for example, if the parking lot and the hotel, they were just different parcels and the parking lot was serving some other property and the government took that parking lot, there's no damages to the parcel with the hotel and the landowner would not be entitled to anything. But you're the one who's insisting on the lots being treated separately. I'm insisting on the same presumption that you begin the analysis by identifying the relevant parcel. Here, that has to be lot E. It was purchased separately. It's a separate deed. It was purchased for separate purposes, and it is the lot that is regulated. If we begin the analysis, what more is there if you're saying we isolate E and E now is of no value, it can't be sold, it can't be built on. What is the consequence of saying we isolate and identify parcel E? Is it the same as if the government physically took parcel E? It's not a physical taking, but it may have the same practical effect because the value of lot E is diminished from $410,000 to $40,000. There's a 90% decrease in value. But there is some use that can be made of this parcel. Lot E cannot be developed on its own. That ability has been taken away. Yes, but if the combined properties are sold, it's going to be a much bigger price tag than it's just taxed for sale. But the question is, the MERS began with two building sites on separate properties. That was taken away. The value that you're talking about is the value that comes from being able to build. Will the MERS already have a house on lot F? So when you say what is the value afterwards, the better methodology is how much would the MERS or someone who owned lot F with an existing house on lot F pay to add land to it? How much would they pay to add lot E to their existing building site? Let me give you an example which might help me. Let's go back to Holmes' case. There's 100 acres. There are 50 columns of coal to hold up the ceiling. That, he says, is okay. No compensation. But wait. Suppose instead of one person owning all 50 acres, suppose 50 people each own one acre. And in some cases, the column runs through the acre and some it doesn't. Does that make any difference? That hypothetical is not analogous to this situation. I don't care if it's analogous or not analogous. I'm trying to get my thinking clearer, and oddly enough, different things make my thinking clearer, and this may be one of them. The analysis has to begin by defining the parcel of property that is legible. In your opinion, if in the Holmes' case, instead of one person owning the whole 50 acres as one lot, there would have been 50 people who each owned an acre. Now, it looks the same, you know. The columns are in the same place, et cetera. And you're saying that does make a difference. Yes or no? It does make a difference. And the key is to look at the parcel of property that is owned by an individual and is that property being taken away. There's two questions here. The usual way, Mr. Groen, or at least a frequent way in which this comes up, is a developer buys 100 acres of land, and that land is split up into 101 acre parcels. And let's say 15.15% of them are on wetlands and can't be built on. It makes an enormous difference whether we're going to say that those 15% are independent lots, because if they are, then the developer comes in and says, you have to pay me for all of that. But if they're not, the developer is out of luck because it's only 15% of the whole. Isn't that right? The beginning part of your analysis says the developer subdivided. The developer cannot subdivide without government approval. And when there's a subdivision that is created under the laws of that state, then rights attach. Yes, well, the subdivision has occurred with government approval and the merger provision has occurred with government approval, saying that this shouldn't be understood in the case of substandard lots as independent. The merger provision is like the wetlands provision. Both restrict use. And then the question then, once you've identified the relevant parcel in your hypothetical, the question is, is there a taking of that 15%? The burden would be on the government to show that that 15% of the lots is actually part of an integrated economic unit as a whole, and then you proceed under a takings analysis. But in both situations, you must first define the relevant parcel. Unless there are further questions, I'd like to reserve the remainder of my time for rebuttal. Thank you, counsel. Mr. Saitley. Mr. Chief Justice, and may it please the Court, I would like to begin, Mr. Chief Justice, by answering your question or the point that you made. The lots here have merged for all relevant purposes under state law. It is true that the lot line between Lot E and Lot F still exists, but that has absolutely no continuing legal relevance under state law. Your point raises my exact concern. You said for all relevant purposes. The question is, what purposes are relevant? And it seems to me that what purposes are relevant is analysis under the takings clause. And we all know the issues, I think, that Justice Breyer brought up. Let's say you have three acres of wetlands and you own 100 acres. You say, well, my property is these three acres, and you've taken it all. The law is you don't get, Mr. Groen, doesn't get to define property interests that way because it's gaming the system by saying this is what it is. Now, as another one of my colleagues pointed out, there are two halves of the state law here. Half of it is the lot line. Half of it is the merger. And you want to say, well, for takings purposes, all we look at is the merger. And it seems to me that that's just the flip side of what the landowner can't do. You can't sort of preempt the takings analysis by saying we're only going to look at this aspect under which, of course, we win. Just like the property owner says we're only going to look at these three acres under which, of course, we win. No, I want to be even more specific. What I meant by all relevant purposes, I mean for all purposes under state law. If tomorrow someone went to the county register and deeds and deleted the lot line between lot E and F, there is not a single right that the MERS have under state law that they would lose. And there's not a single right they would gain. Well, but the point is they didn't do that. Nobody did that. And I'm looking at page 3 of the appendix to the county's brief, and that's the basis on which the analysis was done. And it says they did not decide whether lots have been formally merged. And it's the language that is used throughout. These were effectively merged. Well, I mean, then on the other side, I think they can argue, well, we effectively drew lines around these three acres. And it seems to me that there's a confusion between the definition of property and the question of whether or not there's a takings. And if you start analyzing with the takings factors under whether there's property, that muddles the whole analysis. Well, Your Honor, let me explain the state's methodology. And then I think in doing that, I think I'll be able to answer your question more clearly. The test to identify the relevant parcel in the state submission should be one straightforward question. Is the land lot an issue completely separate from any other land under state law? And there you look at all of state law and where the state law lot line has no meaning for anyone. It has it does not give any rights, which is the case here. So if lots are contiguous, that's the end of the question for you. Not at all, Your Honor. Our test is if two lots have a link, a legal link under state law, then they are one parcel. If they have no legal link under state law, then they are completely separate. But you're talking just about state law. It seems to me that your position is as wooden and as vulnerable to criticism as the petitioners. You say whatever state law, but basically you're saying whatever state law does, that defines the property. But you have to look at the reasonable investment backed expectations of the owner. Right, Your Honor. And I want to clarify that what we're talking about here is just the threshold question. And after the threshold question is determined, the reasonable expectations will, in the vast majority of cases, be analyzed as part of the Penn Central analysis. The approach urged by the federal government, the county, and in the rebuttal... But the reasonable investment backed expectation was based on the fact that you had a lot line rule, which you've now changed. So you say that state law can change reasonable investment backed expectations. Your Honor, I want to be clear. When you're doing the second step, the hard work of the takings analysis, the pre-existence of the lot lines, what the investment backed expectations were, can all be taken into account. The problem with the approach urged by the county, the federal government, and my friends in saying it's a rebuttal presumption, is you basically have Penn Central squared. Well, let me give you this example. It's not that far from this case. A plumber and his wife buy a small lot, but it's a lot on which you can build houses at that time. And they build a modest house. And they say, you know, there's a lot next door. Let's buy that. We can use it as a yard for our children when they're growing up. And then after they're grown, we can sell it and we'll have some money for retirement. And that's a buildable lot at that time. And then this new regulation is adopted, and now the side lot can't be sold at all. And they say, well, look, you've taken away this valuable asset we were going to use for our retirement. And the answer is, well, no, because you could sell your whole property, and somebody who wants to build a big house could build on that property. And they say, well, that's fine, but we like our little house. We'd like to stay in our little house. Now, what is fair about that situation? Your Honor, I want to clarify. I believe that in your hypothetical, when you had two lots that were preexisting and owned by the same person, and then they were involuntarily merged by government action, and the houses would in fact be on each lot separately. It is completely different. What do you mean by they were involuntarily merged by government action? They had two lots. The same person had two lots. They were each completely independent under state law. A new state law comes in and says those are merged. That is a completely different analysis, and I would agree with your Honor's premise. That wouldn't fall under your regulation? Why isn't that this case? No, Your Honor. The fundamental difference in this case is that the merger happened by voluntary action of the plaintiffs. And what the plaintiffs did when they acquired two contiguous substandard lots is... But it's by voluntary action as defined by state law. The state law takes that voluntary action, and it's the state law that makes the consequence, and that's the consequence we're talking about. Well, Your Honor, I think the questions that Justice Kagan was asking clarify this point. That is to say, if you want to, in this case, talk about what this regulation did in 1976, is it put a conditional stale restriction on the parents who own lot E. Well, you know, that's a very fine argument, except for the fact that it's completely contrary to the reasoning in Palazzolo. Justice Kennedy's opinion in Palazzolo rejects that, and the debate between Justice O'Connor in concurrence and Justice Scalia in concurrence is about exactly that. And you don't even cite Palazzolo in your brief, do you? That is not correct. On pages 41 through 43, we discuss why this is not a Palazzolo-type claim. A Palazzolo-type claim, as Justice Kagan's questions indicated, would be that something happened in 1976 that was unreasonable. And by unreasonable, I mean that it took property without just compensation. So there would have to be a look back to 1976 to see if the relevant takings test fails, and it wouldn't fail here because what happened in 1976? The parents owned lot E only, and their interest to lot E was protected by the grandfather clause. The only additional restriction upon the parents that was placed in 1976 by the state was a conditional sale restriction. That is, you can do anything with the lot you want. You can sell it to whoever you want. The only thing you can't do practically is sell it to someone who only wants to buy it if they also own a lot next door and also is substandard. That is a conditional sale restriction, a very minor restriction. And as we pointed out in pages 41 through 43 of our brief, they have not brought that kind of claim, which takes them out of the world of problems. Go ahead. If one lot is owned by a wholly owned corporation or an LLC and the other is owned by the owner in the owner's own name, are they considered to be under common ownership under Wisconsin law? No, Your Honor. No. Unless you can pierce the corporate veil, which is obviously a very high standard. What about husband owns one lot, wife owns the other? They're different? The state hasn't taken a file position on that. My understanding is the county, which is the first line enforcer of this, would interpret it that way. Interpret it what way? Interpret it that if they are not literally the same person, even if it's husband and wife, even if it's two people and one of them owns one and one of them owns the other and it's not the same two people. May I clarify? I'm sorry, I didn't hear the end of your sentence. That is my understanding of the county's interpretation. Well, what is? That they're still treated separately? They're still treated separately. That's the exact same thing. Well, that makes it seem we're talking about injustice and fairness. That seems to make it seem a little quirky that these owners are not entitled to treat them separately while if they just happen to record them in separate names, they would be in an entirely different situation. Well, let me explain what the state is trying to achieve in this law. It wants to ultimately phase out substandard lots in the long term. It does not want to interfere with any current investment back expectations. So what it says is we're going to have a slow phase out, and it's going to be only triggered by the situation where people end up taking the lots in common ownership, and that will happen in the long term. Most people in this area bring the lots into common ownership on purpose, and why do they do that? Well, they won't after today, I mean, or if you win, they'll be smart enough to say, okay, husband, you own F, I will own E, and by the way, you're my successor in interest under E, and I'm your successor in interest under F, and then we'll be fine. Does the whole takings issue really turn on that? Yes, Your Honor, and let me tell you why we do think it will be effective. Because most people bring these lots into common ownership purposefully, and the reason they do that is they want to build a single house up on the bluff, a bigger house. So the reason, and we think that that will happen over time. It's already happened with eight property owners in this area. So while it is a slow phase out of lots, it is a perfectly sensible regime. It balances, on one hand, the desire to protect investment, settle back. Well, I would suppose that in my hypothetical, the husband owner on one side and the wife owner on the other side, they can build a common house on the two lots, can't they? The merger of the two lots that bring them to common ownership makes it easier to comply with other regulatory restrictions on the area about minimum lot size and things of that sort. If you don't bring them into common ownership, then you're left with the nonconforming structure that's on your nonconforming lot. May I have one question, just a background question? Suppose these people had lot E and F merged, then they bought a G and H. Can they still build one house, just one? It would depend on the size of G and H, how much net project area. Suppose they're just like these lots. Well, Your Honor, so right now, it's about 0.98. They have E and F, then they buy G and H. Can they build only one house or two? All right, Your Honor, just let me, two sentences, I think I can answer the question. Right now, it's 0.98 net project area. If lot G is more than 0.2 per project area, they can build one house. And then the new lot gets them the new net project area. So basically, in order to have two buildable lots, you have to add up to more than two acres of net project area. It makes no difference under your approach that the two lots were taxed separately, does it? No, Your Honor. So that doesn't make a difference. It makes no difference under your approach that there were lot lines separating the two lots, right? That's right, Your Honor. Are there other aspects in which the two lots are treated separately that make no difference under your approach? So with regard to the tax assessor, that was an error that the tax assessor made. In fact, that fact militates strongly in favor of the rule that we urge. Because in our rule, you look at only state law, and you look at whether the lots are actually separate under state law. Under the all things considered approach, Are these lots actually separate under state law? There is no legal situation in which the lot line between lot E and lot F makes any difference right now. So that's not quite an answer. Are they legally separate under state law? They're still shown on the plat as separate lots, correct? That's correct, Your Honor. So to what extent is it wrong for me to understand that the only sense in which the merger doctrine that you're talking about applies is with respect to a takings claim? No, Your Honor. With regard to every possible use or sale of these lots, any development, any sale, anything else a person in the real world would want to do, there would be no difference. There's not a single action that someone could take, that they couldn't take if the lot line was deleted. It makes no difference. The lot line between lot E and lot F, as it currently stands, Well then, so there's no reason to under state law, there is a procedure to eliminate the lot lines. And you're saying that that procedure is irrelevant in this case? Given the specific facts of this case, it would be completely irrelevant. No one would go through that process because it would not add or subtract any single right to the merge if they deleted that lot line. May I ask you a question? The difference between you and the other folks on that side of the room is that they want to look at reasonable expectations, and state law in part defines those reasonable expectations, but they're allowing for the idea that other things might come in as well, and you're saying it's all and only state law. Now, I'm pretty sympathetic to the idea that preexisting state law really does influence quite a bit your expectations about what property you own and what you can do with it. But still, what's the harm of doing what the government and the county want rather than what you want in terms of saying analysis should be a little bit more fluid? Sure, state law matters, but maybe other things matter too in a particular situation. Because what you get with any of their approaches is Penn Central squared. That is to say you have a complex multi-factor analysis, basically an all-things-considered analysis at step one, just to figure out the parcel. And then in the vast majority of cases, you then do a complex multi-factor analysis, which is going to look at a lot of the same factors. I think one area of agreement among the parties and the amicus briefs in this case is this area of law is incredibly complicated. It's difficult to make your way through the weeds. Would it matter to you if it were not possible to build a house that bridged the two lots? Suppose one lot is at the bottom of a cliff and the other is at the top of a cliff. Would that matter to you? In defining what the relevant parcel is, it would not. It would matter quite a bit in doing the hard work of doing the Penn Central analysis. And that's one of the key points I'd like to reemphasize. May I finish my sentence? We believe that most of the work under Ted King's law should be done at that second step, usually Penn Central. We believe the first step, the parcel question, should be determined in a straightforward way so the courts can move on to doing the hard work of Penn Central. Thank you, Your Honors. Thank you, Counsel. Mr. Lazarus? Mr. Chief Justice, and may it please the Court, just like cities and counties in at least 33 states have done for decades, for more than 40 years, St. Croix County has excluded from its grandfather clause for preexisting lots, commonly owned substandard adjacent lots. During all those decades, no court at any time in any jurisdiction in the United States has held that exclusion. Exclusion amounts to a taking, and for good reason. It's fair and it's just. And the same reason... Well, that's... It gets to the questions I was asking earlier, fairness and justness. And actually, the point that was last made by your friend, there are two different questions, what is property and whether there's been a taking. And I thought the question of fairness and justness is applied to the second question. I didn't think it was applied to defining what the property was because then you really do get, as he said, Penn Central squared. You're looking at fairness and justice. How should we define this property? Well, fairness and justice for what purpose? Well, for the takings clause. And then once you define it, then you say, well, it's fairness and justice for whether there's been a taking. It seems to me you're just kind of teeing up the definition of property to give you the right answer under the takings clause. Your Honor, in this case, and, Valley, there is some circularity here, but let me tell you why there's some circularity here. And that is because they're making a takings challenge for a very odd topic, and that is the absence of an exclusion. And the reason why there's no exclusion for these kinds of substandard, commonly known adjacent lots is precisely because government has determined over decades that in this situation, the economic impact isn't so great. There isn't so hardship. So the premise of these ordinances is the absence of hardship. And since the purpose of the Penn Central analysis or the Lucas analysis for economic impact is to identify when the hardship really is so great to justify the payment of just compensation, it's not surprising that the very teachings of these ordinances is directly relevant to how you evaluate the project. How can you say that the impact is not, is categorically not great? If somebody buys a lot next to that person's house with the expectation of selling it at some point in the future to meet real needs that come up then, and then a regulation is adopted that says, well, sorry, you can't sell it. There's no hardship there? The hardship, the question, though, is how you define the extent of the hardship. And what you need to look at under the Penn Central analysis is what the economic impact is. And the defining the parcel part of that is to identify what the impact is. For instance, in this case, the economic impact on the murals, right, has to take into account the shared value of the two, because the fact is, if you look, there is no genuine issue of material fact by the lower courts on this question. The value of the two parcels together for one house is $698,000. The value of the two houses separate with a house on each is $771,000. Well, that's fine, except that in order to realize the value of the two lots put together, they would have to move away. Right. And you think that's irrelevant. The takings inquiry is what the economic impact is on them. It shouldn't be a different test depending upon their particular subjective preferences than someone else's subjective preferences. The fact is that... I thought what you're saying is we have to look at what's fair and just. And now you say, well, we disregard the situation of the particular people who are involved. Well, no, what you're looking at is several things. You're looking at first what the economic impact is, define the parcel in a way which actually evaluates the real impact, not a fictional impact, but the real impact. The real impact here is very little. You're also taking into account the state law. You're looking at the law at the time to figure out what the reasonable expectations are of people. You're taking that into account as well. The other thing you're taking into account, Your Honor, is the point you mentioned before. Contiguousness by itself wouldn't be enough. We aren't arguing that. One thing you'd look at is the state law for expectations. You'd also look at the physical and geographic characteristics of the property. In other words, to find out whether there was any real potential here for unity of use, integrated use. For instance, in this case, if lot E and F were different and you had one up above and one down below, that might well be a harder case to suggest that there was that kind of unity of use integrated. You look at those three things because what you're trying to look for to evaluate the parcel is you're trying to see what the real burden is that people are suffering in the case. It's a remarkable finding that there's such a little difference in value between one house on two and two houses each on one. And the reason for that, there's actually a formal term in economics for it. It's called the complementarity principle. But you don't need to know that term. It's just common sense. There's some kinds of property, land is one of them, that can create value joined that doesn't exist when separate. The most extreme example are shoes. No one would pay very much for just a right shoe or a left shoe. But they pay a fair amount for the two shoes together. Land is not an extreme example like shoes, but the same phenomenon seems to exist. You're trying to figure out then what the land interest is. And usually there's a regular way to do that, which is you go down to the county office and you look at what the lines are between your property and somebody else's or your lot and a different lot. You don't look to whether one's below and one's above or that. And it seems to me that gets into a very complicated situation when for federal takings purposes you're redefining what state law says property is. What you're doing, Your Honor, is you're trying to determine the economic impact. There's no question state law defines what you own. But the question of whether it's a taking, that's a question of federal constitutional law. And the economic impact inquiry has to see to what extent there really is this incredibly disproportionate burden they're facing or not. In the Penn Central case, the Keystone-By-Two in this case, in every one of those cases state law defined as separate property interests. Things can be bought and sold. The air rights can be bought and sold. The support estate can be bought and sold. The mineral estate can be bought and sold under state law. They were distinct property rights under state law. And the court nonetheless, as a matter of federal constitutional law, joined them together because the court wanted to find out whether, in fact, there was that kind of economic burden. And they even did it in cases involving lot lines. Well, what about adding it? Would I look to see the reasonableness of the regulation? I mean, suppose in Holmes' case the regulation had said you have to leave columns of 1,000 feet of coal. But every expert said, or everyone who knew about it, said you don't need more than 50 feet. Well, it certainly is true in the open analysis you pay attention to reasonableness. You pay attention to whether the government, you don't just accept the government thing. It doesn't automatically qualify. Does that fit in your three? Absolutely. It fits under Penn Central. And in this case, this is really the easy case. It's almost a sui generis case because the state law issue is one which is premised on the notion that under this circumstance you actually don't face such a great hardship. That's exactly why they don't get the exemption. So this is it. They're not challenging a restriction. They're actually challenging not getting an exemption which someone else is getting. And the reason they're not getting that exemption is they don't have the same hardship that other people have. The owner of the isolated lot, substandard lot, absent some kind of exemption, they face the prospect of a complete economic wipeout. But the owner of two substandard adjacent lots, they don't. That person, like the first, they have development options. In addition, they have the opportunity, as I said before, to create value. Value that doesn't exist separate. And in this case, the value of joining the property together, the reason why this property, which is a beautiful property, stunningly beautiful in the St. Croix River at the bend of the river, the reason why it's so valuable is two things, river frontage and privacy. That's the touchstone of value here. Lot F is only 58 feet wide at the bottom, about the distance between the two columns in this room, and right next to a public area. Lot E adds 100 feet, twice that of river frontage. And off to the west, more privacy. When you add those two lots together, the value of this luxury lot at the bend of the river is so great, it actually almost overcomes the loss in value of not having the second home on the lot. I'm sorry. I've had a problem with the appraisal figures, and it may be a step I'm missing. Why would anybody pay $400,000 for a lot they can't build on? The two values, as your example said, the two lots put together are less valuable or more valuable. Just a little less valuable. Yeah. I know there's only a 10% difference, but as I understood the appraisal figures, and I'm now using estimates, each lot was worth about $350,000 and $400,000 separately for a value of $750,000. Together they were valued at $680,000. So they weren't, you didn't double the price. No, but what you did is you didn't lose very much. By not being able to build the second home, the value doesn't sort of tap. Instead, the value goes only down by 9%. And the reason is that the combined lot is this luxury lot. This is a high-end. No, no, I understand why the combination, but why would anybody buy the lot you can't develop on? The question is not what the value of lot E as a unit that you can't develop or build on. The question is what the value of lot E is to the MERS who also own lot F, because that's how you define what the burden is to them. And the burden to them, if someone only owns lot E, then the hardship exemption would apply and they could build. That's exactly the distinction that the ordinance draws between the two. Is this right? Just say yes or no, and if it's wrong, I'll figure it out later. Are you saying, look, of course you look at the lines that the state draws, but that isn't determinative, because you want to know the total impact on the person, which may get you to look at nearby property or other things. You want to know how reasonable this regulation and effects it is. You want to know whether he knew when he bought it, and perhaps there are others. Is that basically what you're saying? You're not denying that you look at the state's lines. It's just that they're not determinative. Mr. Chief Justice, may I answer the question? He wanted one word. Yes. Yes. Yes. Thank you, counsel. Ms. Prelogar. Mr. Chief Justice, and may it please the Court, I'd like to begin with your question, Mr. Chief Justice, about why it wouldn't be sensible to just look at lot lines here as the starting point for defining the parcel as a whole. And as Justice Breyer just noted, we think that lot lines are certainly relevant, especially insofar as they might shape reasonable expectations about how property owners expect to use their property and what they expect to remain separate and distinct. But we'd urge this Court not to adopt a presumption or a bright-line rule that focuses on lot lines in isolation. And we really see two principal problems with that, one of which is practical and the other is legal. Well, I'm sorry. Go ahead. Just turning to the practical point first, especially when you're looking at contiguous commonly-owned property, which is the situation the Court's confronting here, we think that lot lines will frequently not be an accurate indicator of how that claimant is being burdened by the particular regulation. And that's because when you have those contiguous commonly-owned lots, there's a physical unity that frequently opens up the potential for linked use, linked development, a direct reciprocity of advantage, and shared value. And so when thinking about how to address the parcel as a whole issue, where the whole purpose, the whole point is to get a feel for how the regulation is actually impacting this claimant, focusing on lot lines would exclude relevant considerations about the on-the-ground economic reality. See, I just don't know how that works with property. Not asking whether there's a takings, but asking whether there's property. You say it depends on spatial, functional, and what's the third thing? Temporal. Temporal considerations. Well, you usually don't say that when you're asking about property. You say, I own lot E, or I own lot F, and here it is on the map. That's what I own. You don't sit down and say, well, but with spatial considerations, I own this much of it, and when temporal considerations add this and functional that. It seems to me that those concerns are pertinent at considering whether there's a taking of the property. But when it comes to what the property is, that's a whole different question, and you don't get into spatial. You get into what the plat looks like in the county office. I think it's absolutely the case that in terms of defining what's a protected property interest at the outset, you look to state law, you look to lot lines, and no one's contesting here that there's a protected property interest. But we think that this relevant parcel determination does come into the second part of the inquiry in terms of whether there's been a taking. It's about how do you get a feel for the relevant unit of property that's at issue to determine how this regulation is actually affecting this claimant. And so we would put those considerations on the taking side of the line. This court has always shown a preference in deciding, as Justice Breyer said and Justice Holmes' famous formulation, whether a regulation goes too far. The court's always shown a preference for being able to engage in that kind of contextual analysis that focuses on all of the relevant facts and circumstances. The problem I have with your test, which has the three components, is I don't actually see anywhere in there any weight given to the state property lines. You don't explicitly list it among those three items. You don't tell us how you're weighing it or not weighing it, what presumptions you're giving it or not. So where does it fit into your three factors? We think that it frequently goes to the functional considerations because it shapes expectations about how land can properly be used, whether it's an entirely separate and distinct issue. So we do think that there's a role for state law to play. And here we think actually that's one of the... If we think there should be more of a role, where would you put it? St. Croix puts it on the second prong. Where would you end up putting it and why do you disagree with how they use it? I think it's very important not to adopt any kind of presumption or bright-line rule for the relevant parcel. And so I also would put it on the second prong of conducting the Penn Central analysis. But the reason for that is because the relevant parcel, the threshold definitional question, is going to provide the touchstone that contextualizes the whole rest of the takings inquiry. And if the court were to artificially narrow it and look only at lot lines or give presumptive weight to those lot lines, then that's going to be the focal point for measuring economic impact, for looking at investment-backed expectations. Suppose you have lots that are not contiguous but they're very close to each other. Now, under your flexible approach with all these different dimensions, are they ruled out as a single parcel? I think it would be very difficult to say that those kinds of non-contiguous properties function as an integrated economic unit. So I think it would be the rare case where it would be appropriate to aggregate those property interests. But I think that it is important to keep in mind that there are so many different ways that property interests arise that it is important to have a flexible, nuanced approach here. And, Justice Alito, I would just point to the example we've raised about the large developer who acquires a large tract, maybe 1,000 acres of property, and subdivides it into hundreds. Well, that can easily be taken care of by making the rule look to the lots as defined at the time of the acquisition, rather than something that was done prior to the time when a rule would be applied. But, you know, it's fine to say that there are all these dimensions and it should be nuanced, and who can be opposed to something that's nuanced? But what are we looking for? What are we looking for? We're looking at all these dimensions to determine what? Could you just say as precisely as you can what we should be looking for in defining what is the property that is taken using all of the different dimensions that are relevant in your view? I think the clearest articulation I have is to say that you should be looking for what, in the interest of fairness and justice, is an accurate way to measure economic impact. And that's the point of the relevant parcel determination. It's focused specifically on the economic impact prong of the equation. And is it the economic impact on these particular owners or on some category of hypothetical owners? It's always been an individualized inquiry focused on these particular owners. And I think that the facts of this case well illustrate the point that when you're conducting that kind of valuation, it's often the case, as Mr. Lazarus said, that you're going to have a shared value, a reciprocal value. Well, what if a lot was preserved? What if it was bought for the purpose of selling it at some point in the future? And or it was preserved for that purpose so that nothing was built on it, so that it could readily be sold? I think that those kinds of reasonable investment-backed expectations have a role to play, but I don't think that they can be dispositive because, again, the point of the relevant parcel determination is to accurately gauge economic impact. But I do think that it's important... Well, why wouldn't they be determinative? I thought you said it was we look to legitimate expectations. Their expectations are completely frustrated. It's certainly the case that anytime anyone's alleging a regulatory taking, the premise of the claim is that they're being prevented from doing something with their property that they wanted to do with it. We think that that's not sufficient to alone define the relevant parcel because it might be the case, as it is here, that there's actually not much of an economic impact at all. And if that's the case, then this isn't the kind of regulation that is requiring someone to shoulder a burden that in the interest of fairness and justice... Well, but I come back to my... But you're saying that they have to move. They can't afford to build a big house here, which is what everybody wants. They don't want these little modest houses anymore. They want McMansions. They have to move. That's what you're saying. Well, to the extent that a court were to conclude that that is an undue interference with their investment-backed expectations or that the character of that government action is actually unjust and anomalous, then I think that this Court's precedent already builds in sufficient protection for those kinds of interests without trying to rely solely on expectations to identify the relevant parcel. But I thought reasonable investment expectations were objective. You're now making them subjective. Oh, no, to be clear, Justice Kennedy, we do think that it has to be an objective inquiry, and I understood Justice Alito to be focusing on a fact pattern where the property was acquired before the relevant regulatory restriction was enacted and thereby frustrated the expectations. Here we think it's actually a critical fact that petitioners voluntarily brought this land under common ownership and so triggered the application of the merger provision decades after the relevant regulatory restriction was in place. And that does weaken the idea that there were any objectively reasonable expectations there. I actually think they did it... The parents did it after the ordinances. From my timeline creation, the ordinance was passed in 1976, and in 1982 the parents took the property under common ownership from the Atlantic Plumbing Company. That's correct. So neither the parents or the children, if they had been paying attention to the regulatory scheme, had a reasonable expectation that the ordinance wouldn't affect them. That's exactly correct. We think that the timing here of the relevant transfers of property reinforces the idea that it's proper to view these two parcels together as an integrated whole. And the other facts that I would add to that are the spatial ones, the fact that these are contiguous, commonly owned tracts with possibilities for linked development and linked uses that creates that direct shared value that is borne out by the valuation evidence in this case. Because it is significant here that if you view these lots together as an effectively merged parcel, as they are under state law, then the value is only 10% less than the value of two separate lots with two separate building sites. By saying effectively merged, do you mean not really merged? Absolutely. We're not suggesting that the lot lines have been erased here. And so we do think that those lot lines continue to have a role to play. Except with respect to takings. No, we think that they do have a role to play with respect to takings, but that it's also important to conduct the same kind of contextual analysis that's been the hallmark of this court's regulatory takings jurisprudence. Thank you, counsel. Mr. Groen, you have four minutes remaining. Thank you. Beginning with the multi-factor nuanced approach, the reason why that kind of approach to defining the property interest, remember the first issue is we have to define the property interest that is the subject of the takings claim. The reason is because the whole real estate industry from mortgage lenders to property owners to title insurance companies all rely upon the geographic boundaries, and it's exactly as was suggested. With the regulations that affect those boundaries. I'm sorry? With the regulations that affect those boundaries, whether it's a title company or anyone else, they look at what the paper talks about as a property line and what regulations do with respect to that line. And when the regulations redefine and impose a new definition, the reliance that previously existed is undermined, and that is the gravamen of the takings claim. It is not a redefinition that absolves liability. So what do we do with the fact, as I see it, that these properties were bought separately, one by the parents, the other by their company, and that post-regulations, knowing exactly what they were doing, and you say they didn't, but that has to do with their choice, because you buy everything subject to regulation. You may not choose to look at it, but you should. Ignorance of the law is not a defense anywhere. I don't know why it should be in the regulatory context, but putting that aside, they took the title to the property in their own names post-regulation. Yes, they did. This is a normal American family who understands when you buy property and you have a deed and it's zoned for residential use in a subdivision, you get to use it, and you get to pass it on to your kids. Everything you own is subject to regulatory requirements. I buy a piece of property 10 years ago or 20 years ago, and I didn't know I had to put a sprinkler system in. Today, if you want to do any kind of renovation, you've got to put one in. There's lots of regulations that you didn't buy expecting, but they do affect you. But the Murrs bought two separate parcels that comprised two separate building lots, and that has now been taken away from them. They didn't buy them. They got them in 1982, subject to knowing that they could only develop on one. Well, that circles right back to the Palazzolo argument that we discussed earlier. The other issue I'd like to address is this reliance that we're just talking about with subdivisions and deeds. That is a system that all of this country relies upon, and if we're going to undermine that, that is a serious step in taking away rights and property that people traditionally understand and use in their daily lives. That's the protection that's talked about in Roth v. Board of Regents. The second thing is this valuation question, and a couple of points on that. All the discussion about, well, the property's valuable because it's waterfront, all of that discussion goes to the merits of the takings claim. In other words, how much economic impact is there? The first step is to define the relevant unit of property for analysis, and that step is looking at the deeds and the geographic boundaries of Lot E. That is the presumption. When you turn to the valuation question, the notion that the combined Lot E-F has value because it's waterfront, that is ignoring the fundamental aspect that the valuation in a residential lot is because you can build on it, and that is what has been taken from the MERS. They previously had two building sites. Now they have one. The valuation that the county discusses, the value is not attributed to Lot E because Lot F has the building site. So, really, the county is getting a windfall by suggesting that, oh, well, you can have this bigger, better lot, and that will enable you to recover from the compensation. That goes to the question on remand of how do you determine the amount of damages. Thank you very much. Thank you, counsel. The case is submitted.